**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALKALINE WATER HOLDINGS, LLC, KEYSTONE WATER HOLDINGS, LLC and H2O STATION HOLDINGS, LLC<br><br>Plaintiffs,<br><br>v.<br><br>RYAN WEAR, CREATIVE TECHNOLOGIES, LLC, WATER STATION MANAGEMENT, LLC, WST FRANCHISE SYSTEMS LLC, WATER STATION HOLDINGS LLC, ARIZONA VENDORS INCORPORATED, HARRISON STREET, LLC, ICE & WATER VENDORS, LLC, IDEAL PROPERTY INVESTMENTS LLC, IDEAL 1400 GREENLEAF LLC, REFRESHING USA, LLC, REFRESHING CALIFORNIA, LLC, REFRESHING COLORADO LLC, REFRESHING FLORIDA LLC, REFRESHING GEORGIA, LLC, REFRESHING GREAT LAKES, LLC, RERESHING NEW MEXICO, LLC, REFRESHING NEW ENGLAND LLC, REFRESHING TEXAS LLC, REFRESHING OKLAHOMA LLC, SMART SODA HOLDINGS, INC., SMOKEY POINT HOLDING LLC, SUMMIT MANAGEMENT SERVICES, TCR PLUMBING LLC, VENDPRO, LLC d/b/a EliteVend, WST AZ PROPERTIES LLC, 4300 FOREST LLC, 1206 HEWITT LLC, 70 NO GARDEN, LLC, 3422 W CLARENDON LLC, 204 NWW LLC, 701 EDEN AVE LLC, 2129 ANDREA LANE LLC, 602 SOUTH MEADOW LLC, 11519 SOUTH PETROPARK LLC, 343 JOHNNY CLARK LLC, 1118 VIRGINIA AVENUE LLC, 204 NWW LLC, JEREMY BRIGGS, RICHARD WEAR, KEVIN NOONEY, NICHOLAS STREETER and JOHN DOES 1-100, | : | **Civil Action No.**<br><br><br><br><br><br>**JURY TRIAL DEMAND** |

Defendants.

Plaintiffs Alkaline Water Holdings, LLC ("**Alkaline Holdings**"), Keystone Water Holdings, LLC ("**Keystone Holdings**") and H2O Station Holdings, LLC ("**H2O Holdings**") (collectively, "**Plaintiffs**") hereby bring this Action against RYAN WEAR, CREATIVE TECHNOLOGIES, LLC, WATER STATION MANAGEMENT, LLC, WST FRANCHISE SYSTEMS LLC, WATER STATION HOLDINGS LLC, ARIZONAVENDORS INCORPORATED, HARRISON STREET, LLC, ICE & WATER VENDORS, LLC, IDEAL PROPERTY INVESTMENTS LLC, IDEAL 1400 GREENLEAF LLC, REFRESHING USA, LLC, REFRESHING CALIFORNIA, LLC, REFRESHING COLORADO LLC, REFRESHING FLORIDA LLC, REFRESHING GEORGIA, LLC, REFRESHING GREATLAKES, LLC, RERESHING NEW MEXICO, LLC, REFRESHING NEW ENGLAND LLC, REFRESHING TEXAS LLC, REFRESHING OKLAHOMA LLC, SMART SODA HOLDINGS, INC., SMOKEY POINT HOLDING LLC, SUMMIT MANAGEMENT SERVICES, TCR PLUMBING LLC, VENDPRO, LLC d/b/a EliteVend, WST AZ PROPERTIES LLC, 4300 FOREST LLC, 1206 HEWITT LLC, 70 NO GARDEN, LLC, 3422 W CLARENDON LLC, 204 NWW LLC, 701 EDEN AVE LLC, 2129 ANDREA LANE LLC, 602 SOUTH MEADOW LLC, 11519 SOUTH PETROPARK LLC, 343 JOHNNY CLARK LLC, 1118 VIRGINIA AVENUE LLC, 204 NWW LLC, JEREMY BRIGGS, RICHARD WEAR, KEVIN NOONEY, NICHOLAS STREETER and JOHN DOES 1-100, averring:

## INTRODUCTION

1. The Defendants in this case, and potential others, conspired to sell hundreds of investors across the country over $250 million worth of assets that they did not have.

2. At the center of this Ponzi Scheme is an otherwise innocuous product – water vending machines, or water stations ("**Stations**"). Thousands of them. The Defendants associated to raise capital from investors to "sell" Stations that they claimed were in-service at specific locations and generating monthly revenues in specifically represented amounts.

3. Investing was easy. Defendants undertook the obligation to manage and maintain the supposedly existing Stations, making sure that they were in service so as to generate revenue and collecting that revenue on a monthly basis. It was presented as a passive investment that would generate returns of 15-20%.

4. And the Defendants did pay those returns. Until they stopped.

5. What Defendants were actually doing, however, was using the millions of dollars invested by their victims to pay earlier investors the promised returns and to buy unrelated assets and properties that had nothing to do with Stations.

6. In fact, it appears that as much as 90% of the approximately 30,000+ Stations sold by Defendants do not exist. What does exist is an extensive portfolio of other companies, other kinds of vending machine businesses and real estate assets that Defendants created and/or acquired using money that they stole from the Plaintiffs and others like them.

7. The Defendants used mails and wires to orchestrate their scheme, and they used numerous entities to execute this massive fraud.

8. Plaintiffs seek restitution, disgorgement, compensatory, punitive, and treble damages, constructive trust and injunctive relief because of the Defendants'

fraudulent stealing of Plaintiffs' funds violates common and statutory law, including the Racketeering Influenced and Corrupt Organizations Act ("**RICO**").

3. Defendants' unlawful conduct constitutes a classic fraud that RICO is designed to prevent, in addition to violating other statutory and common laws.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to RICO, 18 U.S.C. § 1964 (c) – the Civil RICO Act – and the principles of supplementary jurisdiction. In addition, this Court has jurisdiction pursuant to The Federal Mail Fraud Act 18 U.S.C. § 1341; The Federal Wire Act 18 U.S.C. § 1343, the Financial Transactions Affecting Interstate Commerce 18 U.S.C. §§ 1956 and 1957; the Diversity of Citizenship and claims in excess of $75,000.00 28 U.S.C. § 1332.

5. Because the claims herein arise out of acts and omissions occurring in this District, venue is proper in this District by virtue of 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965(a).

6. By way of summary only, and as described in greater detail below, Defendants availed themselves of the privileges and laws concerning the conducting of business in Pennsylvania by, among other things, raising capital in this State, purporting to sell goods to residents of this State and wiring funds into and receiving funds wired out of this State.

7. In addition, hundreds, if not thousands, of the Stations that the Defendants purported to sell to unsuspecting investors were claimed by Defendants to be located in Pennsylvania, including in Philadelphia.

8. Defendants purported to sell to Plaintiffs over 160 Stations in Pennsylvania, including in Philadelphia.

## PARTIES AND RELEVANT ENTITIES

9. The Plaintiffs are single purpose entities formed for the purpose of investing in Stations.

10. Alkaline Holdings is a Pennsylvania limited liability company of which the sole member is Jeff Greco ("**Greco**").

11. Keystone Holdings is a Pennsylvania limited liability company of which the sole member is Greco.

12. H20 Holdings is a Pennsylvania limited liability company of which the sole member is Doug Fath.

13. Defendant Wear is an adult individual and resident of the State of Washington, with an address of 1029 154th Street NW, Marysville, WA 98271.

14. Defendant Creative Technologies is a Washington limited liability company with a registered address of 2732 Grand Avenue, Suite 122, Everett, WA 98201.

15. Defendant Water Management is a Washington limited liability company with a registered address of 2732 Grand Avenue, Suite 122, Everett, WA 98201.

16. Defendant WST Franchisor is a is a Washington limited liability company with a registered address of 2732 Grand Avenue, Suite 122, Everett, WA 98201.

17. Defendants ARIZONA VENDORS INCORPORATED, HARRISON STREET, LLC, ICE & WATER VENDORS, LLC, IDEAL PROPERTY INVESTMENTS LLC, IDEAL 1400 GREENLEAF LLC, REFRESHING USA, LLC, REFRESHING CALIFORNIA, LLC, REFRESHING COLORADO LLC, REFRESHING FLORIDA LLC, REFRESHING GEORGIA, LLC, REFRESHING GREATLAKES, LLC, RERESHING NEW MEXICO, LLC, REFRESHING NEW ENGLAND LLC, REFRESHING TEXAS LLC, REFRESHING OKLAHOMA LLC, SMART SODA HOLDINGS, INC., SMOKEY POINT HOLDING LLC, SUMMIT MANAGEMENT SERVICES, TCR PLUMBING LLC, VENDPRO, LLC d/b/a EliteVend, WST AZ PROPERTIES LLC, 4300 FOREST LLC, 1206 HEWITT LLC, 70 NO GARDEN, LLC, 3422 W CLARENDON LLC, 204 NWW LLC, 701 EDEN AVE LLC, 2129 ANDREA LANE LLC, 602 SOUTH MEADOW LLC, 11519 SOUTH PETROPARK LLC, 343 JOHNNY CLARK LLC, 1118 VIRGINIA AVENUE LLC, 204 NWW LLC are corporations and limited liability companies created by Wear and the other individual defendants to divert funds stolen from investors in Stations to other, unrelated business endeavors (with Creative Technologies, Water Management and WST Franchisor, "**Entity Defendants**"). On information and belief, the principal place of business of the Entity Defendants is 2732 Grand Avenue, Suite 122, Everett, WA 98201.

18. Defendant Briggs, Controller of Water Management, is an adult individual and citizen of the State of Washington, with a business address of 2732 Grand Avenue, Suite 122, Everett, WA 98201.

19. Defendant R. Wear is an adult individual and citizen of the State of Washington, with an address of 506 Spokane Street, Lamont, WA 99017.

20. Defendant Nooney is an adult individual and citizen of the State of Washington, with an address of 1329 North 152nd Street, Shoreline, WA 98133.

21. Defendant Streeter is Director of Product Development of Water Management, is an adult individual and citizen of the State of Washington, with a business address of 2732 Grand Avenue, Suite 122, Everett, WA 98201.

22. Collectively, Wear, Briggs, R. Wear, Nooney and Streeter are referred to as the "**Individual Defendants**."

23. As at relevant times, the Individual Defendants acted through and utilized the Entity Defendants to perpetrate the fraudulent scheme described in this Complaint.

## FACTS PERTAINING TO ALL CLAIMS

### A. The Individual Defendants Induce Plaintiffs to Invest Over $10 Million in their Water Station Ponzi Scheme.

24. Wear formed Creative Technologies to conduct business in the commercial water dispenser/vending industry, which Defendants have represented to investors like Plaintiffs is a $43 billion market.

25. Wear utilized Creative Technologies to purchase and/or develop Stations, water dispensing machines that allow consumers to fill containers in one, three or five-gallon increments with filtered water.

26. Wear initially acquired a small number of Stations, placed them in service in retail locations and collected monthly revenue from them. As revenue increased, Wear would periodically acquire more Stations.

27. As Wear grew the business, he brought on others to help run it, such as Briggs, Streeter and Nooney, while acted in concert and with the advice of his father, R. Wear.

28. Once Defendants had proof of concept, however, they associated for a different and more nefarious purpose – to leapfrog the steady growth stage and reach directly for a huge payoff.

29. The Individual Defendants therefore set out to find other investors who had the ability to make multi-million-dollar investments, with the intention of representing to those investors that their investments would be used to acquire more Stations even though the Individual Defendants had no intention of doing so.

30. In or around 2020, Wear identified Tyle Sadek, who purchased $4.5 million worth of Stations and engaged Water Management to manage them, as someone who had a network of people who could make similar investments.

31. Wear also identified Kevin Nooney as an individual who could raise capital, and he integrated Nooney deeply into his web of business interests.

32. Initially, Wear and the other Individual Defendants took on investments from third parties, purchased Stations, placed them in service and paid 50% of revenues to the investors while keeping the other 50% for himself.

33. Still, the revenue was not enough to satiate Wear and the other Individual Defendants.

34. Wear and the other Individual Defendants, who were all eyeing a larger payoff whether through private equity acquisition or otherwise, grew

impatient with the pace of growth and Wear decided that paying 50% of revenue to his investors was too high a price for capital.

35. They therefore concocted the "**Buy Back Scheme**."

36. The Individual Defendants began telling new investors that they were going to "buy back" the existing, in-service Stations from the earlier investors, using a fixed rate of return rather than a 50/50 revenue share as an incentive to invest.

37. Wear, R. Wear, Nooney and the other Individual Defendants identified hundreds of investors and over $100 million of capital to supposedly buy back existing, in-service Stations.

38. The problem was, there was not actually $100 million worth of Stations in-service, or maybe even in existence.

39. The Individual Defendants knew this, but they sold them anyway.

40. In 2020, Sadek introduced Greco to Wear.

41. In April 2020, Sadek relayed to Greco in emails, text messages and on phone calls:

a. Wear already placed 3,500 Stations across the country, and he collected steady, monthly revenues from them.

b. Sadek had invested in Stations with Wear using secured Small Business Administration ("**SBA**") loans for "10X leverage."

c. Because the economics are so strong, Wear offers fixed returns that do not depend on the revenue generated by a particular Station.

42. On April 15, 2020, Sadek sent a power point to Greco, created by the Individual Defendants, that purportedly detailed about cash flow and investment returns to induce Plaintiffs into purchasing Stations.

43. On or about May 11, 2020, Sadek emailed Greco a Water Station Management LLC Profit & Loss Statement for the time-period January 2020 through March 2020, which statement indicated gross profits of almost $5 million and net ordinary income of $492,156.60 and a Balance Sheet as of March 31, 2020, in which Water Management represented that it had total assets of nearly $2.7 million and only negligible liabilities of less than $100,000.00, for total equity of $2,551,660.12. Both documents were created by the Individual Defendants.

44. The foregoing financial data was knowingly false and intended to induce investments based on that false data.

45. It was the Defendants' specific intent to paint a false but positive picture of Water Management's financial wherewithal and Station performance to induce Plaintiffs to invest in the scheme.

46. On or about May 12, 2020, Sadek emailed Greco similar financial documents related to Creative Technologies, including a Profit & Loss Statement representing gross profits of over $6.3 million and net income of $1,863,040.39 for the first quarter of 2020 alone and a Balance Sheet in which Wear claimed that Creative Technologies had assets totaling almost $12 million and equity of $11,754,979.57. This data was also false.

47. The foregoing financial data was a fabrication concocted by Defendants to induce investments based on that false data.

48. In presenting the documents referenced in the preceding paragraphs, it was the Individual Defendants' specific intent to paint a false but positive picture of Creative Technologies' financial wherewithal and Station performance to induce Plaintiffs to invest in the scheme.

49. On June 24, 2020, Wear emailed Greco an Excel spreadsheet purporting to identify the 12-month performance histories of 17,587 Stations, including serial numbers for each. Unbeknownst to Greco, there were not 17,587 Stations and the represented revenue was false.

50. This was only one of many financial representations that Wear and the other Individual Defendants made to induce Plaintiffs to invest in Stations; others included a June 24, 2024 email purporting to evidence a list of Stations that Wear had previously sold and intended to buy back, supposed sales data for 537 Stations that Wear intended to buy back using Plaintiffs' funds if they chose to invest, WST Franchisor's historical revenues from 2017 through April 2020, and voluminous data concerning WST Franchisor's Station purchases as of June 19, 2020.

51. Plaintiffs believe that the financial data presented and referenced in above was false, and that the Individual Defendants knew that it was false and presented it anyway to induce Plaintiffs' investments.

52. On July 8, 2020, Wear represented to Greco that he had the ability to place Stations in all of Family Dollar's 7,015 locations, stating: "we get to

identify which ones we want then they will get landlord approval. But we can hand pick the locations and send them a list of 2 locations – 7015 locations."

53. As a further means of inducing Plaintiffs' to invest in Stations, Wear and Streeter sent various emails and attachments between October 2020 and December 7, 2020 purporting to evidence a list of available Family Dollar Stores in which Wear had the ability to place Stations as well as a supposed "Water Vending Agreement" purporting to evidence the agreement described by Wear with Family Dollar that allowed him to place virtually limitless numbers of Stations in Family Dollar locations.

54. Wear and Streeter utilized the Family Dollar representations to induce Plaintiffs into believing that all Stations that they might have purchased were either already placed and in service or could with 100% certainty be placed on one of the seemingly infinite numbers of available Family Dollar locations with which Wear claimed to have a contract.

55. On July 31, 2020, Sadek emailed to Greco a supposed set of modeled projections from the Individual Defendants reflecting the historical and expected performance of Creative Technologies and Water Management, Wear's companies that he was supposedly using already to operate the model that he was trying to sell to Plaintiffs, so as to paint a picture of the expected performance of the investments that Wear was trying to convince them to make (the "**Projections**").

56. The Projections were created by the Individual Defendants, and they were not based on any real data or information.

57. The Creative Technologies Projections indicated expected profits in 2020 of $9,203,640 and profits in 2021 of more than $35 million.

58. The Projections also showed Creative Technologies' assets of over $18 million in 2019, over $26 million expected by the end of 2020 and over $61 million by the end of 2020.

59. The Projections also contained 2021 projected financials for Creative Technologies.

60. Unbeknownst to Plaintiffs, the Projections were baseless.

61. Having made the foregoing representations the specific purpose of fraudulently inducing investments in Stations, Wear explained that the investments would be structured as "franchises," and that investors would buy Stations through Creative Technologies and then obtain management services from Water Management.

62. Wear explained that they were calling the investment a "franchise" because it made it easier to obtain small business administration ("**SBA**") loans. The Individual Defendants were in fact funneling unwitting investors around the country to obtain SBA loans for the supposed purpose of purchasing Stations even though the Individual Defendants intended instead to funnel most of the investments into the Defendant Entities and their business pursuits while paying earlier investors with money stolen from subsequent investors.

63. The Disclosures identified Wear as the Managing Member of the Franchisor and Streeter as the Director of Product Development.

64. In reliance on the foregoing representations and documents, Plaintiffs made four investments totaling $10,659,000.00 in Stations through Wear and the "franchise" model that actually resembled securities more than a franchise operation.

65. On or about October 23, 2020, Alkaline Holdings entered into a purported Franchise Agreement with WST Franchisor ("**Alkaline Franchise Agreement**"). **Exhibit 1.**

66. On November 18, 2020, Alkaline Holdings purchased 294 Water Stations ("**Alkaline Stations**"), purportedly located in California, Georgia, Florida, Idaho, Illinois, Indiana, Kansas, Minnesota, Missouri, Montana, North Carolina, New Mexico, Ohio, Oklahoma, Tennessee and Texas, from Creative Technologies for $2,499,000.00 pursuant to a Bill of Sale ("**Alkaline Bill of Sale**") that listed a location and serial number for each station (the "**First Investment**"). *Alkaline Bill of Sale*, **Exhibit 2**.

67. In connection with the First Investment, on or about November 18, 2020, Alkaline Holdings entered into a Water Station Management, LLC Service and Management Agreement with Wear's company, Water Management (the "**Alkaline Management Agreement**"). *Alkaline Management Agreement*, **Exhibit 3**.

68. As instructed by Wear and Sadek, to finance the First Investment, Alkaline Holdings secured an SBA loan from Celtic Bank (the "**Celtic Loan**").

69. On November 20, 2020, also in reliance on the representations made by Wear and Sadek, H2O Holdings purchased 447 Water Stations ("**H20**

**Stations**"), located in Florida and Texas, from Creative Technologies for $3,799,500.00 pursuant to a Bill of Sale ("**H2O Bill of Sale**") that listed a location and serial number for each station ("**Second Investment**"). *H20 Bill of Sale*, **Exhibit 4**.

70. In connection with the Second Investment, on or about November 18, 2020, in connection with the Water Station Investments, H2O entered into a Water Station Management, LLC Service and Management Agreement with Water Management (the "**H20 Management Agreement**"). *H20 Management Agreement*, **Exhibit 5**.

71. To finance the Second Investment, H2O Holdings secured an SBA loan from Meridian Bank (the "**First Meridian Loan**").

72. On or about January 18, 2021, Keystone Holdings purchased 332 Water Stations ("**Keystone Stations**"), located in North Carolina, North Dakota, New Hampshire, New Jersey, New York, and 164 Stations in Pennsylvania (including in Philadelphia), from Creative Technologies for $2,822,000.00 pursuant to a Bill of Sale ("**Keystone Bill of Sale**") that listed a location and serial number for each station ("**Third Investment**"). *Keystone Bill of Sale*, **Exhibit 6**.

73. On or about January 18, 2021, in connection with the Third Investments, Keystone Holdings entered into a Water Station Management, LLC Service and Management Agreement with Water Management (the "**Keystone Management Agreement**"). *Keystone Management Agreement*, **Exhibit 7**.

74. To finance the Third Investment, Keystone Holdings secured an SBA loan from Meridian Bank (the "**Second Meridian Loan**").

75. On or about February 3, 2021, H2O Holdings purchased an additional 181 Water Stations (the "**Second Set of H2O Stations**"), located in Florida and Texas, from Creative Technologies for $1,538,500.00 pursuant to a Bill of Sale (the "**Second H2O Bill of Sale**") that listed a location and serial number for each station ("**Fourth Investment**"). *Second H2O Bill of Sale*, **Exhibit 8**.

76. In connection with the Fourth Investment, on or about March 1, 2021, H2O entered into another Water Station Management, LLC Service and Management Agreement with Wear's company, Water Station Management, LLC (the "**Second H2O Management Agreement**"). *Second H2O Management Agreement*, **Exhibit 9**.

77. To finance the Fourth Investment, H2O Holdings secured a small business administration loan from Meridian Bank (the "**Third Meridian Loan**").

78. Together, the Celtic Loan and the First, Second and Third Meridian Loans (the "**SBA Loans**") total approximately $9.8 million.

79. Plaintiffs contributed equity of $1,084,000.00 to purchase the Stations.

80. The SBA Loans require Plaintiffs to make monthly payments totaling $120,000.00 - $130,000.00.

81. Plaintiffs would not have obtained the SBA Loans at Wear's direction but for the above-described and other representations and documents purporting to demonstrate an already-established, lucrative model that could be expanded with additional investments of capital from Plaintiffs and others like Plaintiffs.

82. In all, between November 2020 and March 2021, Wear and the other Individual Defendants convinced the Plaintiffs to pay $10,855,600.00 for 1,254 water stations ("**Plaintiffs' Stations**").

83. Wear represented to Plaintiffs at the time of each investment that he already owned and had already placed each Water Station that was the subject of that round of investment, and Plaintiffs reasonably relied on Wear's representations, and were induced by them, into making the First, Second, Third and Fourth Investments ("**Plaintiffs' Investments**").

84. The Alkaline Management Agreement, H2O Management Agreement, Keystone Management Agreement and Second H2O Management Agreements are all substantially identical and are referred to as the "**Management Agreements**."

85. Pursuant to the Management Agreements, Water Management stated that it would place Stations in service at retail locations and manage all related day-to-day operations, such as maintenance and the collection of revenues, for example. Plaintiffs' Water Stations, manage the stations' day-to-day operations, and collect all revenue generated by the stations. *See, e.*g., **Ex. 3**, *Alkaline Management Agreement* at Section One.

86. Also pursuant to the Management Agreements, Water Management represented that it would disburse monthly payments to Plaintiffs irrespective of revenue generated by Plaintiffs' Water Stations as follows: (1) for the first 24 months, fixed payments representing a 20% annual return on Plaintiffs' investments; and (2) from the 25th month on, fixed payments representing 15% annual returns on Plaintiffs' investments (collectively, Items One and Two are referred to as "**Monthly Payments**"). *See, e.g.*, **Ex. 3**, *Alkaline Management Agreement* at Section Three.

87. The Management Agreements also required Water Management to supply Plaintiffs with various types of financial information, including revenue statements, operational cost statements, statements of gross and net profits and annual Operating Reports. *See, e.g.*, **Ex. 3**, *Alkaline Management Agreement* at Sections Three and Seven.

88. Plaintiffs believe that Wear, Nooney and the other Individual Defendants had raised over $113 million by persuading other individuals and entities to invest in their scheme through March 2021.

89. In December 2020, with the Individual Defendants steadily finding new investors, Wear began making Monthly Payments to Plaintiffs.

90. Plaintiffs had no reason to believe at that time what they would come to learn three years later – the payments that they were receiving did not come from their Stations – it came from those who invested after Plaintiffs.

91. Even if all of the Individual Defendants were not aware of that fact initially, they surely became aware of it before they stopped raising capital from unwitting investors.

**B. Defendants Broaden the Scheme.**

92. Having induced Plaintiffs and many others to buy Stations through Wear's "franchise" model, the Individual Defendants recognized an opportunity to quickly and exponentially expand the scheme for their benefit.

93. After all, that was the reason that the Defendants associated – the legitimate component of the Station business might have even been profitable, but not profitable enough. The Defendants wanted to up the stakes substantially, and they did.

94. In early 2022, Wear conceived the concept of a water station bond, a loan that would be made to Wear and his Entities for the supposed purpose of purchasing more Stations and expanding the business (the "**Water Station Bond**").

95. In or around April 2022, Wear closed on the first iteration of the Water Station Bond, a $75 million credit facility (the "**Water Station Bond**").

96. The Water Station Bond allowed Wear to access more capital by representing to the lenders that he had placed in service additional Stations.

97. Following closing, Wear commenced making representations about Station placement in order to access the Water Station Bond funds.

98. While Wear made repeated representations about Station placement to draw funds from the Water Station Bond, he was not actually

placing Stations in service. Instead, he and the other Individual Defendants were using the Entity Defendants to pursue other business interests and/or to pay returns to earlier investors.

99. Over the next year, the Water Station Bond increased to approximately $115 million.

100. In the Spring of 2023, the scheme became untenable and Wear began to miss Monthly Payments and/or make them late.

101. By August 2023, Wear had completely stopped making Monthly Payments, which were already in arrears by a month or more.

102. It made no sense that Wear would have been unable to make Monthly Payments given the cashflows and revenues that he had represented in addition to his access to the Water Station Bond.

103. In September 2023, following the first missed Monthly Payment, Wear communicated, through Sadek and another individual, Jordan Chirico, that additional funds would be coming in January 2024 that would enable Monthly Payments to resume, that additional investments would create at least $5 million in new liquidity, that Wear was selling some of his other business interests (such as the Defendant Entities that he financed using stolen funds) to create liquidity to make Monthly Payments and that he had been paying a "fair amount" of Monthly Payments to some investors.

104. On September 12, 2023, Chirico texted Greco that Wear would be receiving a substantial amount of cash that day that would allow for the Monthly Payments to occur the following day.

105. No Monthly Payment was made the following day.

106. On September 13, 2023, Chirico texted Greco that Wear's business had $2.5 million of liquidity against only $900,000 of required bond and Monthly Payments, meaning that the Monthly Payments were going to be imminently made.

107. On September 18, 2023, Chirico texted Greco that he was in contact with Wear 2-3 times a day and had gull access to Wear's bank accounts, and that they were working to bring the Monthly Payments current via imminent wires, the same manner in which all prior Monthly Payments had been made.

108. They did not.

109. With payments still delinquent, on September 28, 2023, Chirico texted Greco that his Entities were working on a proposal to finance a buyback option for all current investors, like Plaintiffs.

110. No buy-back ever materialized.

111. On October 2, 2023, Chirico texted Greco that he had offered Wear a $40 million financing package to help get the business back on track, but that Wear refused because he did not want to give up equity. Chirico also stated: "If/when he misses a bond payment, because of his cash crunch he will be left with nothing at all, and his equity will be gone and we will still do the financing for the new owners of the equity."

112. On October 24, 2023, Chirico texted Greco that Monthly Payments were going to resume and be brought current due to "a good amount of incoming cash … [that would] clear today or tomorrow."

113. Still, circumstances did not improve.

114. As Plaintiffs requested additional information, Wear continued to invent reasons why he was on the brink of getting current on Monthly Payments and to make promises about when that would happen and how he would avoid similar issues moving forward, but none of it came to fruition.

**C. Plaintiffs learn that they have been defrauded.**

115. At this point, Plaintiffs do not believe that the above-described representations made by any of the Defendants was true when made.

116. Plaintiffs have requested proof that their Stations actually exist, but they have received nothing.

117. Sadek has represented that although he personally purchased over 900 Stations, he has only been able to verify the existence of less than 70 of them. Sadek has already initiated litigation against Wear and others related to Stations, as have approximately 60-70 other investors.

118. Plaintiffs have searched for proof that their Stations generated revenue, but they have found nothing.

119. Plaintiffs believe that the financial data and Projections presented to them were intentionally fabricated to induce them, and many others all over the country, to invest in Stations.

120. Despite Wear's efforts to conceal information about the Stations, for obvious reasons, Plaintiffs have learned that Wear owned or controlled 2,500 or fewer stations. Thus, while Defendants did at least some legitimate business together, separate and apart from the water station Ponzi scheme, they used most of the money for improper purposes.

121. Since Plaintiffs' discovery of the scheme, the State of Washington has opened a securities fraud investigation of Wear and the matters that are the subject of this Action.

122. Plaintiffs have not received a Monthly Payment since August 2023.

123. Piecing it all together, Plaintiffs have concluded that the reason that Defendants are unable to make Monthly Payments is that they are no longer to obtain new investors so as to use their capital to pay earlier investors like Plaintiffs. Wear either never made Monthly Payments using the revenue generated by Plaintiffs' Stations, or he ceased doing so at some point so as to be able to misappropriate those funds to invest in other businesses for his own benefit and/or for the benefit of other Defendants.

124. It is unclear what Wear has done with Plaintiffs' Investments and those of the many others who have been duped, but Plaintiffs are aware that Wear has amassed a substantial vending machine business and real estate portfolio. It is not difficult to connect that massive influx of capital and the failure to make Monthly Payments to the growth of Wear's other business interest.

125. Plaintiffs had no reason to suspect that any of the above-described representations were false or that the documents were total fabrications, as, while Monthly Payments were occasionally late, they were made from December 2020 through August 2023.

126. It is now clear, however, that Defendants obtained over $250 million in investments in Stations based on specific serial number, ownership, location and revenue representations that was all false.

127. It is also clear that Defendants will continue to swindle investors across the country absent judicial intervention. Wear is still soliciting victims:




***See* [www.franchisegator.com/opportunities/waterstation-technology/](http://www.franchisegator.com/opportunities/waterstation-technology/) (last visited April 15, 2024)**

## COUNT ONE

Violations of Sections 1962 (a), (b) and (c) of the Racketeer Influenced and Corrupt Organizations Act

79. The preceding allegations are incorporated by reference.

80. The Defendants operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines "enterprise" to include "any individual partnership, corporation, association or other legal entity and any union or group of individuals associated in fact although not a legal entity."

81. Each of the Entity Defendants are separate entities, and each of the Individual Defendants are separate individuals, and all of the Defendants are associated by the shared purpose of fraudulently inducing investors to invest over $250 million in a water Station Ponzi scheme (the "**Ponzi Scheme Enterprise**").

82. The Ponzi Scheme Enterprise exists separate and apart from the illegal activity in which it engages by fraudulently inducing investments in a business that effectively does not exist. Specifically, the Ponzi Scheme Enterprise began with the legitimate acquisition and management of Stations, which operation continued on even after Defendants decided to grow the business through a massive fraud.

83. The Defendants are also each a "person" within the meaning of 18 U.S.C. § 1961(3), which defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."

84. Each Defendant has a distinct role in the Ponzi Scheme Enterprise.

85. Wear and the Wear Entities function as the purported operational arm of the Ponzi Scheme Enterprise.

86. Briggs and Streeter function as purported directors of the Wear Entities so as to give those entities an air of legitimacy.

87. Nooney functions as the finder of capital to invest in Wear's purported business operations.

88. At all relevant times, the Defendants were engaged in and had activities that affected interstate commerce by soliciting and servicing investors throughout the United States through use of the electronic mails, text messages, telephone calls and interstate wires.

89. The Defendants that have received income derived, directly or indirectly, from a pattern of racketeering activity, and have thus used or invested such income, directly or indirectly, to operate the above-described enterprises in violation of 18 U.S.C. § 1962(a). and U.S.C. § 1962(b)

90. At various times relevant to the events described in this Complaint, the Defendants were employed by or associated with the above-described enterprises and conducted and participated in the affairs of said enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

91. The Defendants directed and controlled the affairs of the above-described enterprises, and their participation in said enterprises were made possible, in whole or in part, by the pattern of racketeering described in this Complaint.

92. The pattern included, among other things, acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and fraud by the

conduct of financial transactions affecting interstate commerce in violation of 18 U.S.C. §§ 1956 and 1957 (including using illegitimately gained capital to close on the Water Station Bond). These acts constitute "racketeering activity" under the RICO Act, 18 U.S.C. § 1961(1).

93. Defendants engaged in various schemes designed to systematically defraud Plaintiffs and other investors like Plaintiffs to the tune of hundreds of millions of dollars. These acts of conversion were accomplished through transactions by mail, text and/or wire.

94. Furthermore, such mail, text message and wire transmissions were made for the sole and exclusive purpose of defrauding Plaintiffs and converting their assets for the Defendants' own use and/or the use of the conduct of their RICO associates constitutes mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343.

95. Such acts constitute "racketeering activities" under 18 U.S.C. § 1961 (1).

96. In addition to the foregoing, the Defendants conducted or attempted to conduct financial transactions affecting interstate and/or foreign commerce by use of electronic funds transfers, involving the proceeds of a specified unlawful activity, knowing that said transactions were designed in whole or in part to conceal the nature and source of said unlawful activity. Some of the transactions which constitute such acts include the wire transfers of all Monthly Payments and payments related to the Water Station Bond. Said acts constitute violations of 18 U.S.C. §§ 1956(a) (1)(B)(i) and 1957.

97. Such acts constitute "racketeering activities" under 18 U.S.C. § 1961(1).

98. The aforesaid acts were undertaken by the Defendants with the same or similar intent, results, accomplices, victims or methods of commission, or are otherwise related by distinguishing characteristics and are not isolated instances.

99. Said predicate acts are, in fact, a regular method by which Defendants conduct the affairs of the above-described enterprises. Said pattern, by its very nature, represents a distinct and ongoing threat of long-term racketeering activity.

100. Defendants have victimized hundreds of investors, and they seek to continue to do so.

101. Defendants' activities constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

102. Plaintiffs invested $10 million in this scheme, purchasing non-existent Stations and/or non-operating/non-placed Water Stations that Defendants represented existed, were placed or would be placed and generated or were generating sufficient revenue to pay the promised rate of returns on Plaintiffs' Water Station Investments.

103. Plaintiffs have incurred substantial debts in the form of the Meridian and Celtic Loans in reliance on the representations of the Defendants.

104. Plaintiffs are entitled to treble damages under 18 U.S.C. § 1964(c).

## **COUNT TWO**

Violation of 18 Pa.C.S.A. 911

105. The foregoing allegations are incorporated by reference.

106. The Defendants have received income derived from a pattern of racketeering activity in which each of them participated as a principal, and with

respect to which each Defendant used the proceeds of such income to operate an enterprise designed to defraud hundreds of investors out of over $250 million.

107. The allegations that support this Cause of Action are stated throughout the Complaint and specifically Count I, which are incorporated by reference.

## COUNT THREE

Violation of Section 1962(d) of the Racketeer Influenced And Corrupt Organizations Act

79. The foregoing allegations are incorporated by reference.

80. The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to directly and indirectly use or invest income derived from a pattern of racketeering activity in an interstate enterprise, and to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a) and 1962(c), in violation of 18 U.S.C. § 1962(d).

81. The Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

82. Each of the Defendants specifically knew about and agreed to facilitate the scheme described herein.

83. As a direct and proximate result of Defendants' conspiracy, their acts of racketeering activity, the overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property, losing millions of dollars.

84. In view of the foregoing, Plaintiffs are entitled to treble damages under 18 U.S.C. § 1964(c).

## COUNT FOUR

Common Law Fraud

85. The foregoing allegations are incorporated by reference.

86. Defendants made the above-described misrepresentations, aware of their falsity or with reckless disregard to their truth, in order to induce Plaintiffs to invest $10 million in Stations and to then refrain from taking any action when Monthly Payments ceased.

87. Plaintiffs reasonably believed the foregoing representations to be true, and reasonably relied on them in making Plaintiffs' Investments.

88. Plaintiffs would not have made their Investments but for the Individual Defendants' misrepresentations, which constitute common law fraud.

89. As a direct and proximate result of the foregoing, Plaintiffs have been injured in an amount to be determined at trial.

90. In engaging in said acts, the Individual Defendants willfully, with oppression, fraud and malice, and in a manner that was extreme, outrageous and directed to more than 200 other investors. For the foregoing reasons, Plaintiffs are entitled to an award of punitive damages.

## COUNT FIVE

Conspiracy to Commit Common Law Fraud

79. The foregoing allegations are incorporated by reference.

80. Each of the Defendants had knowledge of the scheme described in this Complaint and took action in furtherance of it, as more specifically described above.

81. These acts in further include, but are not limited to, the preparation of false financial data the circulation of false financial data to induce additional investments and the concealment of the fact that the business in which investors were being duped to buy into did not actually exist as represented.

## COUNT SIX

Breach of Bills of Sale
Plaintiffs v. Creative Technologies and Wear

82. The foregoing allegations are incorporated by reference.

83. The Bills of Sales are contracts between Creative Technologies and Plaintiffs.

84. Creative Technologies breached the Bills of Sales by selling Stations that did not exist, were not placed, were not generating revenue as represented and/or were not imminently going to be placed so as to generate revenue.

85. Creative Technologies' breaches have damaged Plaintiffs in an amount to be determined at trial.

86. Wear is personally liable for the obligations of Creative Technologies because he used that entity to perpetrate the fraud described in this Complaint.

## COUNT SEVEN

Breach of Management Agreements
Plaintiffs v. Water Management and Wear

87. The foregoing allegations are incorporated by reference.

88. The Management Agreements are contracts between Water Management and Plaintiffs.

89. Water Management breached the Management Agreements by failing to place Plaintiffs' Stations and failing to make Monthly Payments.

90. Water Managements' breaches have damaged Plaintiffs in an amount to be determined at trial.

91. Wear is personally liable for the obligations of Water Management because he used that entity to perpetrate the fraud described in this Complaint.

## COUNT EIGHT

Negligent Misrepresentation

92. The foregoing allegations are incorporated by reference.

93. Defendants, directly or acting on behalf of their respective Entities, made the above-described representations to induce Plaintiffs in to making Plaintiffs' Investments and then to refrain from taking action when Monthly Payments ceased.

94. Defendants, directly or acting on behalf of their respective Entities, should have known that their representations, including but not limited to financial data and the Projections, were false when made.

95. The negligent misrepresentations made by Defendants, directly or acting on behalf of their respective Entities, damaged Plaintiffs in an amount to be determined at trial.

**COUNT NINE**

Imposition Of A Constructive Trust

96. The foregoing allegations are incorporated by reference.

97. Defendants are, upon information and belief, currently in possession of assets belonging to Plaintiffs.

98. Such possession is in diminution of Plaintiffs' superior right, title and interest in said assets.

99. Defendants came into possession of these assets through acts of fraud. Defendants' continued possession of these assets is wrongful.

100. In view of the foregoing, plaintiffs are entitled to imposition of a constructive trust over all such assets wrongfully held by Defendants, together with any profits earned by Defendants while in wrongful possession of these assets.

**WHEREFORE, Plaintiffs respectfully demand that this Court enter judgment as follows:**

(a) Entering a preliminary injunction to restrain Defendants' illegal activity and freeze all ill-gotten assets;

(b) Appointing a receiver to conduct an audit and/or accounting;

(c) Awarding Plaintiffs actual, consequential, punitive and/or treble and incidental damages;

(d) Requiring Defendants' forfeiture of all profits derived from the scheme described in this Complaint;

(e) Awarding Plaintiffs statutory attorney's fees and costs of suit;

(f) Imposing a constructive trust, imposing such trust upon Defendants, and requiring the return of the assets wrongfully converted for defendants' use and benefit, together with any profits, income or monies earned by Defendants during the period of their wrongful possession of said property;

(g) Awarding such further relief as this Court deems just and proper under the circumstances.

/s/ Jordan Rand
Jordan Rand
Monica Quinones
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, PA 19103
jrand@klehr.com
215-569-3024
Attorneys for Plaintiffs

Date: May 3, 2024